## WILSON et al. v. TOWERS.

### In re ANNAPOLIS & CHESAPEAKE BAY POWER CO.

#### No. 3240.

Circuit Court of Appeals, Fourth Circuit.

Jan. 12, 1932.

Edgar Allan Poe, Jr., of Baltimore, Md. (Edgar Allan Poe and Bartlett, Poe & Claggett, all of Baltimore, Md., on the brief), for appellants.

William A. Grimes and Stuart S. Janney, both of Baltimore, Md. (Janney, Ober & Williams, of Baltimore, Md., on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and WEBB, District Judge.

NORTHCOTT, Circuit Judge.

In January, 1931, in the District Court of the United States for the district of Maryland, Albert G. Towers was appointed receiver of the Annapolis & Chesapeake Bay Power Company, a corporation. This action was taken in the suit of George Baker Schoeder against the power company. The stock of the power company was wholly owned by the Washington, Baltimore & Annapolis Electric Railroad Company, a corporation operating an interurban railroad.

Neither the power company nor the Washington, Baltimore & Annapolis generated electrical power. The power company had, on July 1, 1923, entered into a contract with the Washington, Baltimore & Annapolis for the purchase of power from that company. The pertinent part of this contract reads as follows:

"* * * Whereas the power company has not facilities for the generation of electrical energy and has heretofore purchased from the railroad all of the electrical energy used and sold by the power company; and

"Whereas both parties hereto are desirous that the railroad shall continue to furnish the power company all of the electrical energy used and sold by the power company * * *

It is hereby agreed as follows: "1. The Railroad agrees to furnish and deliver to the Power Company and the Power Company agrees to take at the places mutually agreed upon, such amount of electrical energy as the Power Company may desire to secure from the Railroad for use or sale by the Power Company at the price of two and three tenths ($.023) per kilowatt hour, based on the net cost of electrical energy to the Railroad of one cent ($0.01) per kilowatt hour."

At the time this contract was entered into the price the power company agreed to pay for the 60-cycle current was in excess of the cost thereof to the railroad company, but as the entire stock of the power company was owned by the railroad company the former company had little or no choice in the matter, and as long as both companies were solvent, as they were at the

time of the making of the contract, no creditor was interested.

Power was purchased under this contract until October, 1928, when the power company, without protest from the railroad company, secured its 60-cycle current from another company at a much less rate than that fixed in the contract of July 1, 1923. This arrangement continued until July 18, ·1930, when the power company again began paying the railroad company the price fixed in the July 1, 1923, contract. The result was to take the "spread" between the prices mentioned from the power company and pay the money to the railroad company.

Before the hearing of this suit, the railroad company had become involved financially, and a receiver had been appointed for it.

The receiver of the power company filed a petition in the pending suit, asking the court to construe the contract, and that he be directed not to pay the railroad company the "spread" in the price.

The learned judge below in a well considered memorandum[1] construed the contract of July 1, 1923, as not requiring the power company to purchase all its power from the railroad company, and entered an order relieving the receiver from the conditions of the contract.

Appellants, who constituted a committee for the bondholders of the first mortgage bonds of the Baltimore & Annapolis Short Line Railroad Company, which bonds were guaranteed by the Washington, Baltimore & Annapolis Railroad, and who had intervened in the suit, brought this appeal.

■ The question involved is the construction of the contract. It is contended on behalf of the appellants that, reading the contract as a whole, and construing the "whereas" or recital clauses with the operative or agreement clause, the contract binds the power company to purchase all the current needer or used by it from the railroad company. The rules of construction contended for on behalf of the appellants apply only where there is an existing ambiguity, but they will not be applied to create uncertainty.

■ Here there is no ambiguity in the operative part of this contract. There is no uncertainty in the use, in a commercial sense, of the word "desire." The phrase "such amount of electrical energy as the Power Company may desire to secure from the Railroad Company" is clear and explicit, and needs no aid to interpretation. It certainly does not mean "all the Power Company may need or use."

■ The rule has been long established that: "If the recitals are clear and the operative part is ambiguous, the recitals govern the construction. If the recitals are ambiguous, and the operative part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part is to be preferred." Ex Parte Dawes, L. R. 17 Q. B. D. 275. See, also, Williams v. Barkley, 165 N. Y. 48, 58 N. E. 765.

If an ambiguity existed and we were compelled to resort to the contract as a whole or to the conditions surrounding the parties at the time the contract was entered into, the fact that at that time the railroad was endeavoring to market the bond issue of the power company, and simply wanted to guarantee to prospective purchasers of these bonds an adequate supply of electrical energy for the power company would argue for the interpretation of the contract given by the judge below.

Again the conduct of the railroad in allowing the alleged conditions of the contract to be set aside and the contract completely ignored for a long period of time, and until the railroad company became involved, would tend to prove that the railroad did not consider the contract other than in the light of an option to the power company.[2]

The cases relied upon by attorneys for appellants have been carefully examined. They apply to contracts finally construed as binding the purchasers to take "all" of the thing mentioned that the purchaser needs or can use for a certain purpose. Such is not the case here.

It might well be questioned whether, even should the contract be construed as is contended on behalf of appellants, a court of equity, having charge of the power compa-

---

[1] Oral opinion.

[2] A discussion of contracts of this character will be found in the following cases: Cold Blast Transportation Co. v. Kansas City Bolt and Nut Co. (C. C. A.) 114 F. 77, 57 L. R. A. 696; Willard Sutherland & Co. v. United States, 262 U. S. 489, 43 S. Ct. 592, 67 L. Ed. 1086; A. Santaella & Co. v. Otto F. Lange Co. (C. C. A.) 155 F. 719; American Cotton Oil Co. v. Kirk (C. C. A.) 68 F. 791; Leach v. Kentucky Block Cannel Coal Co. (D. C.) 256 F. 686; Wakem & McLaughlin, Inc., v. Culver (C. C. A.) 28 F.(2d) 942; Northern Iowa Gas & Electric Company v. Luverne (D. C.) 257 F. 818; Incorporated Town of Laurens, Iowa, v. Northern Iowa Gas & Electric Co. (C. C. A.) 282 F. 432; Hutchinson Gas & Fuel Co. v. Wichita Natural Gas Company (C. C. A.) 267 F. 35.

ny, would not relieve the receiver from carrying out the contract as being burdensome, inequitable, and unjust, and a legal fraud upon the power company, but in view of our conclusion as to the construction of the contract it is not necessary to discuss that point.

The decree of the court below is accordingly affirmed.